SHAKOPEE MDEWAKANTON SIOUX COMMUNITY and Edith Crooks, United States of America, Intervenor Below, Appellees,

v.

CITY OF PRIOR LAKE, MINNESOTA, Appellant.

Nos. 84–5167, 85–5018.

United States Court of Appeals, Eighth Circuit.

Submitted Feb. 12, 1985.

Decided Aug. 30, 1985.

Phillip A. Cole, Minneapolis, Minn., for appellant.

John E. Jacobson, Minneapolis, Minn., and Marie E. Klimesz, Dept. of Justice, Washington, D.C., for appellees.

Before LAY, Chief Judge, HEANEY and FAGG, Circuit Judges.

LAY, Chief Judge.

The City of Prior Lake, Minnesota, appeals the decision of the district court[1] granting a permanent injunction requested by the Shakopee Mdewakanton Sioux Community, individual plaintiff Edith Crooks, and the intervenor United States (collectively referred to as the Community), against Prior Lake and awarding attorneys' fees pursuant to 42 U.S.C. §§ 1973*l* (e), 1988 (1982). Prior Lake also appeals the district court's calculation of attorneys' fees. We affirm the declaratory judgment and the issuance of the permanent injunction by the district court; we modify the award of attorney fees.

**Facts**

The almost 300 acre Shakopee Mdewakanton Sioux Reservation is located northeast of Prior Lake, Minnesota. In the early 1800s, the Mdewakanton Band of Sioux occupied with other Sioux bands the southern one-third of the present state of Minnesota. The Sioux bands ceded their lands to the United States in a series of treaties in the mid-nineteenth century. A reservation promised the Mdewakanton Band in an 1858 treaty was finally created with the purchase of three parcels of land in Scott County and Eagle Creek Township in 1890 and 1891. The United States has held the land constituting the Shakopee Mdewakanton Sioux Reservation (the Reservation) in trust for the Community since the purchase.

In 1972, Prior Lake annexed a portion of Eagle Creek Township pursuant to Minn. Stat. § 414.031. The description of the lands included in the annexation, found in the Municipal Commission of the State of Minnesota's 1972 findings of fact and conclusions of law, specifically refers to the northern boundary of part of the Reservation as forming a portion of the Eagle Creek Township territory annexed to Prior Lake. The district court found that the Reservation lands were part of the political unit comprising Eagle Creek Township in 1972.

In 1983, the City Council of Prior Lake passed a resolution revising the boundaries of Prior Lake's election precincts. The resolution changed the number of precincts from two to three, and explicitly excluded the Reservation lands lying within the boundaries of precinct number two. The resolution thus excepted Reservation residents otherwise eligible from voting in municipal elections and from receiving municipal services on the same basis as that upon which such services are provided to other residents of Prior Lake. Eligible voters living on the Reservation apparently did vote in municipal elections between 1972 and 1983. Reservation fire and rescue protection services have been performed since 1982 under a contract between Prior Lake and the manager of the Reservation's commercial bingo operation, and are subject to cancellation with three months' written notice.

The Community brought this action for declaratory and injunctive relief, attorneys' fees and costs pursuant to U.S. Const. amend. XIV; 42 U.S.C. §§ 1971(a)(1), (a)(2)(A), 1973a, 1983 (1982); and 25 U.S.C. § 465 (1982). The Community sought a declaratory judgment that Reservation residents are also residents of Prior Lake and are entitled to all rights attending such municipal residency. The Community also sought a permanent injunction ordering Prior Lake not to prevent Reservation residents otherwise eligible from participating in municipal elections and further enjoining Prior Lake from failing to provide Reservation residents with police, fire, rescue, and other municipal services in the same manner as that in which services are provided other Prior Lake residents. Prior Lake filed a counterclaim for a declaratory judgment that if Reservation residents were found to be residents of Prior Lake, all municipal ordinances, regulations, and all state and federal laws would apply to

1. The Honorable Paul A. Magnuson, United States District Judge for the District of Minnesota.

Reservation residents. Prior Lake further requested an injunction permanently enjoining Reservation residents from violating such ordinances, regulations, and laws. The district court granted the declaratory and injunctive relief requested by the Community, and dismissed Prior Lake's counterclaim.

The district court also granted the Community's request for attorneys' fees and costs. In a supplemental opinion, the court awarded the Community attorneys' fees totalling $17,383.31. Prior Lake appeals the district court's decision on the merits and the award of attorneys' fees.

**Discussion**

Prior Lake raises several issues on appeal, contending that the district court erred (1) in finding the Reservation was a part of Eagle Creek Township, (2) in holding that the Reservation could be annexed under either state or federal law, (3) in awarding attorneys' fees and costs to the Community, and (4) in calculating the attorneys' fees award using a base hourly rate higher than either the attorneys' contract rate with the Community or his own current hourly billing rate. We affirm the district court on the first three points; we modify the district court's order on attorney fees.

1. Declaratory and Injunctive Relief

■ Prior Lake first argues the district court erred in finding the Reservation was part of Eagle River Township at the time of the 1972 annexation. Because the Municipal Commission annexation order included only territory which was a portion of Eagle River Township, Prior Lake contends the Reservation was not made a part of the annexation. We cannot say the district court erred in finding the Reservation was part of the Eagle River Township political unit in 1972. The evidence supports the district court's finding that the Reservation was encompassed geographically within Eagle River Township in 1972. Prior Lake appears to argue that because the Reservation is held in trust by the United States and is not fully subject to state

jurisdiction, it was never made a part of the political unit of Eagle Creek Township.

■ In *Little Thunder v. State of South Dakota,* 518 F.2d 1253 (8th Cir.1975), this court held that residents of unorganized counties—counties which are attached to adjoining organized counties for the purposes of government and administration—possess a substantial interest in the choice of county officials governing their affairs, and thus cannot be denied the right to vote in elections of the governing organized counties. We stated that "[t]he fact that plaintiffs are reservation Indians is not of great significance. While it is true that * * * the state has limited jurisdiction over them, the effects of county government are not completely absent." *Little Thunder,* 518 F.2d at 1257. Congress conferred United States citizenship on Indians as a group with the passage of 8 U.S.C. § 1401(b) (1982). State and local citizenship are derivatives of federal citizenship. *See Goodluck v. Apache County,* 417 F.Supp. 13, 15 (D.Ariz.1975), *aff'd,* 429 U.S. 876, 97 S.Ct. 225, 50 L.Ed.2d 160 (1976). That a tribal government exercises sovereign powers on a reservation and that reservation lands are held in trust by the United States does not prevent the reservation from constituting a portion of a state and a political subdivision of a state. The Municipal Commission of Minnesota's 1972 findings specifically included the Reservation within Eagle Creek Township. We agree with the district court that the Reservation clearly was part of Eagle Creek Township at the time of the 1972 annexation proceedings. *Cf. Howard v. Commissioners of the Sinking Fund,* 344 U.S. 624, 626–27, 73 S.Ct. 465, 466–67, 97 L.Ed. 617 (1953) (holding a state can include federal lands within its municipal boundaries so long as the plenary federal jurisdiction within the federal enclave is not disturbed); *Chase v. McMasters,* 573 F.2d 1011, 1018–19 (8th Cir.), *cert. denied,* 439 U.S. 965, 99 S.Ct. 453, 58 L.Ed.2d 423 (1978) (holding a municipality violated the Supremacy Clause in refusing to connect land held in trust by the United States to city water and sewer lines al-

though expressly declining to decide whether a municipality must provide all municipal services to Indians living on tax-exempt property).

■ Prior Lake argues that even if the district court did not err in finding that the Reservation was included in the portion of Eagle River Township annexed in 1972, the annexation was prohibited under state and federal law and thus is void. Although the district court found that the requirements in the Minnesota annexation statute were met by the 1972 proceedings, *see* Minn.Stat. Ann. § 414.031 (West Supp.1985), Prior Lake argues that a "judicial gloss" on the annexation statute creating an "implied prerequisite" to annexation was not satisfied.[2] In *State v. City of White Bear Lake*, 255 Minn. 28, 95 N.W.2d 294 (1959), the Supreme Court of Minnesota construed the Minnesota annexation statute to include an "implied prerequisite" requiring "the annexation territory as a whole [to be] so conditioned as properly to be subjected to [city government] * * *." *City of White Bear Lake*, 255 Minn. at 34–35, 95 N.W.2d at 299. The state court designated three factors necessary to determine if property is "so conditioned:"

(1) that the platted portion of the lands contains a compact center or nucleus of population, (2) that the adjacent unplatted lands are suburban in character, and (3) that the unplatted lands have with the platted portions of the annexing city a

unity of interest in the maintenance of a city government.

*Id.* (footnote omitted).

■ Prior Lake contends that because it cannot subject Reservation residents to municipal taxes or ordinances, the Reservation fails to meet the *City of White Bear Lake* implied prerequisite to annexation. It is true that Reservation residents are not subject to municipal civil regulatory control. *See Bryan v. Itasca County*, 426 U.S. 373, 388, 96 S.Ct. 2102, 2110, 48 L.Ed.2d 710 (1976) (stating that the legislative history of Pub.L. 280, 67 Stat. 588 (codified as amended at 18 U.S.C. § 1162, 25 U.S.C. §§ 1321–26, 28 U.S.C. § 1360 (1982) does not support an extension of civil jurisdiction to the states that could undermine tribal government, "a possible result if tribal governments and reservation Indians were subordinated to the full panoply of civil regulatory powers * * * of state and local governments") (footnote omitted); *United States v. County of Humboldt*, 615 F.2d 1260 (9th Cir.1980); *Santa Rosa Band of Indians v. Kings County*, 532 F.2d 655 (9th Cir.1975), *cert. denied*, 429 U.S. 1038, 97 S.Ct. 731, 50 L.Ed.2d 748 (1977). There is no discernible reason, however, as to why the sovereign status of the Reservation precludes satisfaction of the implied prerequisite to annexation in Minnesota. As the district court noted, the Municipal Commission of the State of Minnesota in its 1972 order approving the annexation addressed the factors listed in *City of White Bear Lake* and found them satisfied. It is undisputed that Prior Lake did not object to the 1972 findings.[3] We hold that the

---

**2.** Prior Lake further urges that the district court should have granted its motion for certification to the Minnesota Supreme Court of the question of whether federal enclaves or Indian lands held in trust are annexable under the Minnesota statute. We decline to follow Prior Lake's suggestion to this court to certify the issue to the Minnesota Supreme Court. *See* Minn.Stat.Ann. § 480.061 subd. 1 (West Supp.1985). The Minnesota annexation statute and the Minnesota Supreme Court's construction of the statute in *State v. City of White Bear Lake*, 225 Minn. 28, 95 N.W.2d 294 (1959), provide this court with sufficient guidance to decide the state annexation powers issue. Absent a "close" question and lack of state sources enabling a nonconjectural determination, a federal court should not

avoid its responsibility to determine all issues before it. Indeed, the probable delay caused by the certification process would outweigh any benefit the state court's response could provide in this case. *See Hatfield v. Bishop Clarkson Memorial Hospital*, 679 F.2d 1258, 1261 n. 4 (8th Cir.1982).

**3.** *Bryan v. Itasca County*, 426 U.S. 373, 96 S.Ct. 2102, 48 L.Ed.2d 710 (1976), the United States Supreme Court case construing the scope of state regulatory and tax jurisdiction over Indian reservations under Pub.L. 280, was decided after the 1972 annexation proceedings. Prior Lake argues that it did not challenge the Municipal Commission's order of annexation because the special trust status of the Reservation "was not appreciated at all in Minnesota prior to 1976."

district court did not err in refusing to invalidate the annexation on the basis of failure to meet the Minnesota annexation statute.

■ Prior Lake also contends federal law prohibited annexation of the Reservation absent the Community's consent; because the Community did not consent, the annexation was invalid. Prior Lake's reasoning is based on a 1968 amendment to Pub.L. 280, *see* 25 U.S.C. § 1326 (1982), which requires states wishing to assume jurisdiction over Indian country under Pub.L. 280 to obtain the consent of a majority of the adult enrolled Indians in the affected area. Prior Lake further relies on a statement in *Bryan* that the 1968 amendment to Pub.L. 280 "requires tribal consent as a condition to further state assumptions of the jurisdiction provided in [Pub.L. 280]." *Bryan*, 426 U.S. at 386, 96 S.Ct. at 2110. Prior Lake misconstrues both the 1968 amendment to Pub.L. 280 and the Supreme Court's statement in *Bryan*. In passing Pub.L. 280 in 1953, Congress expressly transferred criminal and civil jurisdiction over Indian country to certain states, including Minnesota,[4] *see* 18 U.S.C.

§ 1162; 28 U.S.C. § 1360, and empowered remaining states to assert, if they chose to do so, jurisdiction over Indian country located within their boundaries. The 1968 amendment requires tribal consent before a state that did not acquire jurisdiction over Indian country before 1968 can assert such jurisdiction.[5] As the Supreme Court recently stated, the 1968 amendments "add[ed] tribal consent requirements, [but] those requirements were not made retroactive; the 1968 amendments therefore did not displace jurisdiction previously assumed under Pub.L. 280 * * *." *Three Affiliated Tribes v. Wold Engineering*, 467 U.S. 138, 104 S.Ct. 2267, 2276, 81 L.Ed.2d 113 (1984) (footnote omitted). Because Minnesota acquired criminal and civil jurisdiction with the passage of Pub.L. 280, the 1968 amendments did not eliminate Minnesota's jurisdiction; tribal consent is unnecessary in Minnesota to an exercise of jurisdiction within the bounds of Pub.L. 280.

■ More importantly, Prior Lake mistakenly equates annexation with an increase of civil jurisdiction over the Reservation. The annexation, however, did noth-

---

Prior Lake cannot employ a decision reached four years after the annexation to read the *City of White Bear Lake* implied prerequisite as not having been satisfied at the time of the annexation. In any event, we find no indication from state sources that *Bryan* rendered Indian trust lands unannexable under state law.

4. The Red Lake Reservation in Minnesota was exempted from the conferral of jurisdiction.

5. 25 U.S.C. § 1321 reads in relevant part:

   **Assumption by State of criminal jurisdiction**
   **(a) Consent of United States; force and effect of criminal laws**
   The consent of the United States is hereby given to any State not having jurisdiction over criminal offenses committed by or against Indians in the areas of Indian country situated within such State to assume, with the consent of the Indian tribe occupying the particular Indian country or part thereof which could be affected by such assumption, such measure of jurisdiction over any or all of such offenses committed within such Indian country or any part thereof as may be determined by such State to the same extent that such

State has jurisdiction over any such offense committed elsewhere within the State, and the criminal laws of such State shall have the same force and effect within such Indian country or part thereof as they have elsewhere within that State.

25 U.S.C. § 1322 reads in relevant part:
   **Assumption by State of civil jurisdiction**
   **(a) Consent of United States; force and effect of civil laws**
   The consent of the United States is hereby given to any State not having jurisdiction over civil causes of action between Indians or to which Indians are parties which arise in the areas of Indian country situated within such State to assume, with the consent of the tribe occupying the particular Indian country or part thereof which would be affected by such assumption, such measure of jurisdiction over any or all such civil causes of action arising within such Indian country or any part thereof as may be determined by such State to the same extent that such state has jurisdiction over other civil cause of action, and those civil laws of such State that are of general application to private persons or private property shall have the same force and effect within such Indian country or part thereof as they have elsewhere within the State.

ing more than change the boundaries of the City of Prior Lake. After 1972, the Reservation was located within the limits of the City of Prior Lake rather than within the limits of Eagle River Township. The Minnesota annexation statute neither "frustrates nor interferes with tribal self-government * * *," *Chase*, 573 F.2d at 1018, nor "impairs a right granted or reserved by federal law." *Id.; see also Three Affiliated Tribes*, 104 S.Ct. at 2274. The 1972 annexation was valid under federal law. Prior Lake has neither more nor less jurisdiction over the Reservation than did Eagle River Township.

We hold that neither state nor federal law prevented Prior Lake from annexing the Reservation. Prior Lake conceded in the district court that if the annexation were valid, eligible Reservation residents would be entitled to vote in municipal elections, and all Reservation residents would be entitled to the benefits of citizenship in Prior Lake. We thus affirm the district court's order declaring Reservation residents citizens of Prior Lake and permanently enjoining Prior Lake from preventing eligible Reservation residents from participating in the City's elections and from refusing to provide municipal services to Reservation residents on the same basis as that upon which municipal services are provided to other Prior Lake citizens. Because annexation does not increase municipal civil regulatory jurisdiction over Indian country, we also affirm the dismissal of Prior Lake's counterclaim.

### 2. Attorneys' Fees

Prior Lake contends the district court abused its discretion in awarding attorneys' fees to the Community pursuant to 42 U.S.C. §§ 1973*l* (e), 1988. Although we agree with Prior Lake that not every political dispute with a tribal government is a civil rights dispute, we cannot say the district court abused its discretion in awarding attorney fees to the Community.

The issues in this case concern the right of Reservation residents to vote and to receive municipal services on an equal basis with other Prior Lake residents. These kinds of questions are within the purview of the statutes under which the district court awarded the Community attorneys' fees. Because Prior Lake conceded that Reservation residents were entitled to vote and to receive services if the annexation were upheld, the district court did not need to reach the Community's civil rights violations claims. *Monahan v. Nebraska*, 687 F.2d 1164, 1172 (8th Cir.1982), *cert. denied sub nom. Rose v. Nebraska*, 460 U.S. 1012, 103 S.Ct. 1252, 75 L.Ed.2d 481 (1983); *see also Robert M. v. Benton*, 671 F.2d 1104 (8th Cir.1982). The Community's civil rights claims certainly were not frivolous. Absent special circumstances not present here, a successful litigant ordinarily should recover attorneys' fees in section 1983 actions. *See Riddell v. National Democratic Party*, 624 F.2d 539, 543–45 (5th Cir.1980). We hold the district court did not abuse its discretion in awarding attorneys' fees to the Community.

Finally, Prior Lake argues that the district court abused its discretion in its calculation of the amount of the attorneys' fees award because the district court based its computation on an hourly rate higher than both a rate under a contract with the Community which was approved by the Bureau of Indian Affairs and the attorney's own current billing rate. We agree. Under the Bureau of Indian Affairs approved contract with the Shakopee Mdewakanton Sioux Community, the attorney charged $60 per hour before a certain date and $65 per hour after a certain date. The attorney stated in his affidavit that his "current billing rate" is $70 per hour, and that the lower rates charged the Community under the contract reflect both a long relationship between the attorney and the Community and the attorney's perception that he serves the public interest in representing this client. The district court granted the attorney's request for an award of attorneys' fees based on an hourly rate of $100 per hour. The court reasoned that it was not bound by the attorney's own rates in

determining the reasonable hourly rate component of the basic or "lodestar" figure and thus could employ a rate "charged by attorneys of like skill performing similar work [in the relevant community]." Based on the attorney's skill and experience and on an affidavit stating that if the attorney's work had not been under a BIA contract a fair rate of compensation would have been $100–$125 per hour, the district court found the attorney's requested rate "well within [the prevailing] fee range." The court declined, however, to increase the lodestar rate by a multiplier designed to recognize the superior quality of the attorney's services.

■ In *Avalon Cinema Corp. v. Thompson*, 689 F.2d 137 (8th Cir.1982), we set forth the usual procedure to be used in calculating attorneys' fees. The district court first computes the base "lodestar" figure by "multiply[ing] the number of hours reasonably expended times *the lawyer's regular hourly rate.*" *Avalon Cinema Corp.*, 689 F.2d at 139 (emphasis added). The court next considers other relevant factors listed in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir.1974), and can increase or decrease the basic lodestar figure. In rare circumstances the district court can increase a fee award because of the quality of the work performed or the great public importance of the case. As we have recognized in several cases, the critical question is whether the fee award is based on a "reasonable" hourly rate. We do not automatically accept the lawyer's rate as reasonable; we look also to the "ordinary fee 'for similar work in the community'." *Avalon Cinema Corp.*, 689 F.2d at 140, *quoting Johnson* 488 F.2d at 718; *see also Jorstad v. IDS Realty Trust*, 643 F.2d 1305, 1313 n. 4 (8th Cir.1981).

■ In calculating the reasonable fee, a court must be mindful of Congress' intent to encourage the enforcement of constitutional rights through the award of "fees which are adequate to attract competent counsel, but which do not produce windfalls to attorneys." S.Rep. No. 1011, 94th

Cong., 2d Sess. 6 (1976), *reprinted in* 1976 U.S.Code Cong. & Ad.News 5908, 5913. As the District of Columbia Circuit Court noted in *Laffey v. Northwest Airlines, Inc.*, 746 F.2d 4, 24 (D.C.Cir.1984), *cert. denied*, —— U.S. ——, 105 S.Ct. 3488, 87 L.Ed.2d 622 (1985), the lodestar rate is the opportunity cost of the clients the firm turned away to represent the plaintiffs.

■ Congress intended that fee awards be calculated in the same manner for both private counsel and nonprofit legal services organizations. *Blum v. Stenson*, 465 U.S. 886, 104 S.Ct. 1541, 1547, 79 L.Ed.2d 891 (1984). Unlike cases in which the plaintiff's attorneys have no historical billing rates, however, the Community's attorney has well defined billing rates which can be used to determine the lodestar rate if those rates are "reasonable." Accepting the attorney's own contract or billing rate where available as the attorney's evaluation of the prevailing market is not tantamount to calculating fee awards for private attorneys differently from those calculated for nonprofit legal services groups. *See Blum*, 104 S.Ct. at 1547 n. 11.

■ In this case, the attorney is performing the same type of service he performs in his general practice. As such, the attorney's own billing rate provides a reliable indicator of the attorney's assessment of what his clients are willing or able to pay for his services. A second attorney's affidavit submitted by the Community's counsel states that the present rate for attorneys working under BIA approved contracts is $65–$95 per hour and that non-BIA approved contract work performed by an attorney of similar skill and experience in counsel's geographical area could command $100–$125 per hour. The attorney's affidavit stated that he estimated the customary fee for similar work in the area at $75–$125 per hour. Given that the attorney's own billing rates are apparently comparable to general rates charged for similar work, and that $70 per hour represents counsel's own valuation of his work, we

hold that the lodestar hourly rate in this case is $70.[6]

In calculating fees, the court should use the most objective figures possible in determining the lodestar rate. A rate of $70 per hour compensates the attorney in this case for his opportunity costs, but does not provide him with a congressionally prohibited windfall. As the majority in *Laffey* recognized, if the lodestar rate is determined from a range of rates even where more certain figures are available, the fee calculation "merely mimics—rather than provides—mathematical objectivity." *Laffey*, 746 F.2d at 19. In many cases, the attorney's own billing rate will not provide the reliable measure such rates provide in this case where the attorney has hourly rates consistent with those charged in the community and specializes in the area of law which is the subject matter of much of the lawsuit. Absent these characteristics, the courts must rely more heavily on prevailing community rates for similar services than on the attorney's own billing rate. Further, the lodestar is not a cap on the fee award. The figure can still be adjusted upward or downward according to the subjective factors listed in *Johnson*.

As the district court noted, counsel represented the Community with considerable skill. We believe, however, that a $70 per hour rate adequately compensates the attorney for his efforts. We thus reduce the amount of attorneys' fees to reflect a rate of $70 per hour, and award a total of $12,253.31 to the Community in attorneys' fees, calculated as follows:

| | | | |
|---|---|---|---|
| 1. | 171 × 70.00 per hour | = | $11,970.00 |
| 2. | 2.9 × 30.00 per hour | = | 87.00 |
| 3. | Expenses incurred | = | 196.31 |
| | Total | = | $12,253.31 |

**Conclusion**

We affirm the district court's order declaring the residents of the Shakopee Mdewakanton Sioux Reservation residents of the City of Prior Lake, Minnesota, permanently enjoining the City of Prior Lake from providing Reservation residents with municipal services on a different basis than that upon which services are provided other Prior Lake citizens and further enjoining Prior Lake from preventing qualified Reservation residents from participating in Prior Lake elections. We also affirm the district court's dismissal of Prior Lake's counterclaim and the court's award of attorney's fees to the Community. We reverse the district court's order awarding attorney's fees in the amount of $17,383.31, and reduce the fee award to $12,253.31.

Costs on appeal should be awarded to the Community.

So ordered.

---

**6.** We do not base the lodestar rate on the BIA approved contract rate, because such contracts do not necessarily reflect the amount the attorney commands for identical services absent the need for BIA approval.